# EXHIBIT A

Lauretta Y. Welch, WSB #6-4383
Welch Law, PC
P.O Box 567
Driggs, Idaho 83422
(307) 231-6045
(888) 882-7892 (facsimile)
lauretta@welchpc.com
*Attorney for Plaintiff*

FILED
DISTRICT COURT
THIRD JUDICIAL DISTRICT
SWEETWATER COUNTY WY

**OCT 0 4 2023**

DONNA LEE BOBAK
CLERK OF COURT
BY_____
DEPUTY CLERK

## IN THE DISTRICT COURT OF THE THIRD JUDICIAL DISTRICT
## SWEETWATER COUNTY, WYOMING

| | | |
|---|---|---|
| DALE OMSBERG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. CV-23-191-G |
| vs. | ) | |
| | ) | |
| HYDRITE CHEMICAL CO., | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

COMES NOW Plaintiff, Dale Omsberg, by and through his undersigned counsel, and states the following facts constituting his claims for relief against Hydrite Chemical Co.

### PARTIES

1. Plaintiff Dale Omsberg is a resident of Green River, Wyoming.

2. Defendant Hydrite Chemical Co. is a corporation with its principal office located in Brookfield, Wisconsin, regularly conducting business in Sweetwater County, Wyoming.

### JURISDICTION AND VENUE

3. This Court has personal jurisdiction over Plaintiff Dale Omsberg, who lives and works in Sweetwater County, Wyoming.

4.     This Court has personal jurisdiction over Defendant Hydrite Chemical Co.

5.     Defendant regularly conducts business in Sweetwater County Wyoming as a vendor, purposefully availing itself of the privilege of conducting activities in Wyoming.

6.     Defendant's actions in employing and terminating Mr. Omsberg in Wyoming have created consequences within the state of Wyoming.

7.     This Court has jurisdiction over the subject matter of the present action.

8.     The events, transactions, and occurrences forming the factual nexus and subject matter of Plaintiff's Complaint against Defendant took place within the Third Judicial District, Sweetwater County, Wyoming.

## FACTS

9.     Plaintiff Dale Omsberg ("Mr. Omsberg") was employed by Defendant Hydrite Chemical Co. ("Defendant") from January of 2018 until he was terminated on May 25, 2023.

10.    Mr. Omsberg was previously employed by Generations, Inc. d/b/a Organic Defoamer Group, from 2008 until the company was purchased by Defendant in 2018.

11.    Defendant is engaged in the formulation, manufacture and sale of chemicals used as processing aids in the trona industry in Sweetwater County, Wyoming.

12.    Mr. Omsberg's job with Defendant included sales, servicing customer accounts, and assisting operations to maximize production.

13.    Mr. Omsberg brought a significant amount of trona industry experience and contacts to his employment with Defendant and he was highly regarded and trusted, having worked in the local industry since 2006.

14. Soda Ash production is highly regulated and monitored by the government, making industry experience invaluable.

15. In addition to sales, Mr. Omsberg was frequently contacted by industry leaders to help solve complex problems, including process chemistry issues, at the mines-refineries.

16. When Defendant purchased Mr. Omsberg's prior employer, it entered into an Employment Agreement ("Agreement") with Mr. Omsberg. *Exhibit 1-Employment Agreement, attached*.

17. The Agreement was for a stated term of three (3) years, which could be extended for another year upon written agreement between the parties. *Ex. 1*.

18. Pursuant to the terms of the Agreement, Mr. Omsberg was not an employee-at-will and termination was required to be for cause. *Ex. 1*, ¶ 6.

19. Additionally, the Agreement states "In Order to terminate Employees employment for Cause, Defendant shall give Employee written notice stating in reasonable detail the grounds for termination of Employee's employment for Cause." *Ex. 1,* ¶ 1(a).

20. After the three (3) year term expired, Mr. Omsberg remained employed with Defendant without a contract.

21. Defendant did not provide any additional consideration to Mr. Omsberg after the agreement expired to alter his employment status, which required termination for cause and written notice stating the cause of termination.

22. Defendant adopted an Employee Handbook and distributed it to Mr. Omsberg in 2021 and 2022.

23. The Employee Handbook contains a progressive discipline policy and procedures to be followed in the event of termination. *Exhibit 2-Hydrite Progressive Discipline Policy.*

24. Mr. Omsberg's employment relationship with Defendant began to deteriorate in October of 2021, when Defendant changed a polymer formulation, causing significant production losses for Mr. Omsberg's customers.

25. Specifically, the formulation change resulted in a loss of approximately $2.3 million to Defendant's customer, Ciner Wyoming LLC.

26. Defendant pressured Mr. Omsberg to divert the blame for the loss from Defendant to the Ciner engineers.

27. The following year, Defendant continued to change formulas without providing documentation to the customer, or going through the onsite approval process that is required by regulation.

28. More specifically, Defendant made changes to ODFLOC BAMF 400 PLUS, a polymer, DG740, a defoamer, and DG XTL-5HP, a processing aid chemical.

29. In January of 2023, over Mr. Omsberg's objections, Defendant sent unapproved chemicals from a different company to customer Natural Soda to fill an order, causing major production issues.

30. Defendant shipped the next full truck load of DG XTL-5HP chemical totes to Natural Soda without the required seals on each opening in the container, or seal numbers recorded and disclosed on the Bill of Lading, both of which are legally required by the Current Good Manufacturing Practice (CGMP) regulations and monitored by the U.S. Food and Drug Administration (FDA).

31. Mr. Omsberg contacted his manager continuously for two (2) weeks asking him to have tote seals sent out to Natural Soda with a new Bill of Lading that included seal numbers.

32.     This incident was written up by Natural Soda's regulatory department with a hard deadline requirement to respond.

33.     Defendant initially refused to provide a root cause analysis/corrective action plan or otherwise address the problem, resulting in extreme risk to the customer, who could have lost two (2) weeks of production in the event of an audit.

34.     Mr. Omsberg, who was responsible for servicing customer accounts, realized the severity of this type of regulatory noncompliance and the issues it creates for customers and was vocal with management regarding the problem.

35.     Mr. Omsberg had multiple heated exchanges with his management regarding this incident, attempting to stress the importance of the mistake and the severe consequences of failing to expeditiously provide a corrective action plan/root cause analysis before the deadline.

36.     On or about March 22, 2023, Defendant verbally suspended Mr. Omsberg for an indefinite period of time, requesting that he receive a fitness for duty assessment.

37.     In a follow up email entitled "Summary and next step," Defendant cites the reason for the suspension as "expressed concerns from Hydrite employees and your direct threats to others." *Exhibit 3-Email Correspondence, attached.*

38.     The nature of the assessment is vague but consists of two parts: 1) a 2-3 hour assessment with a clinician in person and 2) follow up personality assessments. *Ex. 3.*

39.     Additionally, Defendant states that it would schedule the appointment and that Mr. Omsberg would be required to sign a release, authorizing Defendant to access his private medical information. *Ex. 3.*

40. Defendant notified Mr. Omsberg that he would be suspended until Defendant received the results, holding him hostage to this request. *Ex. 3.*

41. There are no specific incidents, names, or dates for Mr. Omsberg to respond to in the written correspondence. *Ex. 3.*

42. There is no reference to any Hydrite policy that would allow for a suspension and/or require Mr. Omsberg to submit to a clinical assessment upon request. *Ex. 3.*

43. During communications regarding the suspension, the human resource representative was verbally aggressive, stating that Mr. Omsberg was not to tell other Hydrite employees what's legal or illegal.

44. Additionally, Mr. Omsberg was instructed that he was not allowed on site with customers, not allowed to communicate with customers, and not allowed to talk with competitors.

45. These terms were particularly problematic since Mr. Omsberg's position requires regular interaction with customers onsite.

46. Mr. Omsberg was not informed of any customer complaints that would deem this request reasonable.

47. Mr. Omsberg was also not allowed to communicate with any employees at Hydrite other than the human resources representative and Jon Murnik. *Id.*

48. During Mr. Omsberg's suspension and following his termination, Jon Murnik and other Hydrite representatives spread untrue information regarding Mr. Omsberg's mental state throughout the industry.

49. The statements were made specifically to high level management at multiple companies, including mine managers.

50.     These statements combined with Mr. Omsberg's absence, which caused deficiencies in service, have undoubtedly caused harm to his reputation in the industry and the community.

51.     On May 4, 2023, Mr. Omsberg received a letter from Defendant stating that he was being released from employment, effective May 25, 2023.

52.     There is no reason for this employment action stated in the letter or indication that there was an appropriate investigation into this matter by Defendant.

53.     The circumstances surrounding the suspension and termination coincide with Mr. Omsberg's observations and ultimately, his reaction to Defendant changing the ingredients of its products, shipping chemicals without proper seals and providing inadequate paperwork.

54.     Mr. Omsberg requested that Defendant complete a thorough and fair investigation into this matter and his termination, but Defendant refused.

55.     Defendant did not follow its own progressive discipline policy in terminating Mr. Omsberg.

56.     Defendant's progressive discipline policy does not include any provision that would require an employee to submit to an in-person assessment with a clinician or follow up personality tests.

57.     Regarding termination, Defendant's Employee Handbook requires the following:

> Whenever possible, a letter explaining the reasons for termination should be given to the employee at the time of termination and should include the following:
> • Actions that led up to their termination
> • The final incident that brought the Company to the point of termination, including the work rule that was violated
> • That they will receive benefit information from the HR department in the near future

• Information on how to access the Company's Employee Assistance Program.

*Ex. 3*, pg. 27.

58. At the time of his termination, Mr. Omsberg did not receive a letter or any documentation regarding the cause for termination, actions that led up to termination, the final incident that brought the company to the point of termination, or the work rule violated.

## FIRST CAUSE OF ACTION: DEFAMATION

59. Plaintiff re-alleges the allegations set forth in all Paragraphs above and incorporates the same herein by reference.

60. Defendant made false and defamatory communications concerning Mr. Omsberg's mental health and fitness to engage in his trade.

61. These unprivileged communications were disseminated intentionally to multiple third parties, including mine managers.

62. Mr. Omsberg's reputation, including the goodwill, respect and confidence that he has gained over his many years in the industry, have been negatively affected as a result of Defendant's actions.

63. Likewise, Mr. Omsberg's ability to gain employment in the industry has been negatively affected as a result of the dissemination of this false information.

64. At the time Defendant disseminated the information questioning Mr. Omsberg's mental fitness, it knew that that the communications were false, acted in reckless disregard of whether the communications were false, or negligently failed to ascertain whether the communications were false.

65.    Defendant's conduct is malicious and oppressive, in that it was intended to cause injury to Mr. Omsberg or was carried out with a willful and conscious disregard of the rights of Mr. Omsberg, justifying an award of exemplary and punitive damages in an amount according to proof in order to punish Defendant and discourage similar conduct.

66.    As a direct and proximate cause of Defendant's willful acts, Mr. Omsberg has incurred and will continue to incur compensatory and consequential damages in an amount to be proven at trial.

## SECOND CAUSE OF ACTION: RETALIATORY DISCHARGE

67.    Plaintiff re-alleges the allegations set forth in all Paragraphs above and incorporates the same herein by reference.

68.    Defendant's practices of changing formulas without notifying customers and failing to comply with regulatory requirements have caused extreme risk and damage to customers and the public.

69.    When Defendant sent unapproved chemicals from a different company to Natural Soda in January of 2023, over Mr. Omsberg's objections, it caused major production issues.

70.    Then, when the next truck load of chemicals to Natural Soda without seals on chemical totes, or documentation of the seal numbers, there were regulatory implications, including corrective action.

71.    After Defendant initially refused to address the issue, Mr. Omsberg had multiple heated exchanges with his management regarding this incident, attempting to stress the importance of the mistake.

72.    Defendant terminated Mr. Omsberg because he made multiple complaints to management regarding Defendant's dangerous practices.

73.   Society has an interest in protecting employees from retaliation when employees make complaints to their employers regarding dangerous and illegal business practices.

74.   There is no other remedy available to protect the interests of Mr. Omsberg or society from Defendant's actions.

75.   Mr. Omsberg is suffering ongoing economic harm, including lost wages, as a result of the termination.

76.   Defendant's conduct is malicious and oppressive, in that it was intended to cause injury to Mr. Omsberg or was carried out with a willful and conscious disregard of the rights of Mr. Omsberg, justifying an award of exemplary and punitive damages in an amount according to proof in order to punish Defendant and discourage similar conduct.

### THIRD CAUSE OF ACTION: TORTIOUS BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

77.   Plaintiff re-alleges the allegations set forth in all Paragraphs above and incorporates the same herein by reference.

78.   Defendant owed a duty of good faith and fair dealing to Mr. Omsberg due to the special relationship of trust and reliance between Defendant and Mr. Omsberg.

79.   Defendant, an out of state company, bought Mr. Omsberg's employer since 2008, Generations, Inc. d/b/a Organic Defoamer Group, then relied on Mr. Omsberg to maintain relationships and use his specialized expertise to maintain its standing in the industry.

80.   Mr. Omsberg has, in fact, maintained Defendant's standing in the industry by using his relationships and specialized expertise to service customer accounts.

81. In addition to sales, Mr. Omsberg is frequently contacted by industry leaders to help solve complex problems at the mines and he is the only representative from Defendant who lives in Sweetwater County, Wyoming.

82. Defendant breached its duty of good faith and fair dealing to Mr. Omsberg when it suspended him, cut off his communication with industry contacts, required a clinical assessment and ultimately terminated his employment.

83. Defendant acted in bad faith to avoid its responsibilities to Mr. Omsberg and customers.

84. Mr. Omsberg is suffering ongoing economic harm, including lost wages, as a result of the termination.

85. Defendant's conduct is malicious and oppressive, in that it was intended to cause injury to Mr. Omsberg or was carried out with a willful and conscious disregard of the rights of Mr. Omsberg, justifying an award of exemplary and punitive damages in an amount according to proof in order to punish Defendant and discourage similar conduct.

## FOURTH CAUSE OF ACTION: BREACH OF IMPLIED EMPLOYMENT CONTRACT

86. Plaintiff re-alleges the allegations set forth in all Paragraphs above and incorporates the same herein by reference.

87. Defendant wrote or adopted an Employee Handbook that includes a progressive discipline policy and provided it to Mr. Omsberg, creating an implied-in-fact contract.

88. Mr. Omsberg was required to acknowledge receipt of the Employee Handbook which includes legally binding promises made by the employee and the employer.

89.     Defendant's progressive discipline policy does not include any provision that would require an employee to submit to an in-person assessment with a clinician or follow up personality tests.

90.     Defendant's progressive discipline policy does require that, whenever possible, a letter should be given to the employee at the time of termination that details actions that led to the termination, and the final incident that brought the Company to the point of termination, including the work rule that was violated.

91.     Mr. Omsberg did not receive a letter or other documentation regarding these details at the time of termination and has not had the opportunity to address the allegations against him.

92.     Defendant breached its implied contract with Mr. Omsberg when it did not follow its own progressive discipline policy, relied upon by both Defendant and its employees, in terminating Mr. Omsberg.

93.     Mr. Omsberg is suffering ongoing economic harm, including lost wages, as a result of the termination.

    WHEREFORE, Plaintiff prays for the following relief:

1.     Judgement entered in favor of Plaintiff and against Defendant on all counts of Plaintiff's Complaint.

2.     An award of lost wages in an amount to be determined at trial.

3.     An award of compensatory damages in an amount to be determined at trial.

4.     An award of consequential damages in an amount to be determined at trial.

5.     An award of exemplary and punitive damages in an amount to be determined at trial.

6.     An award of Plaintiff's costs and reasonable attorneys' fees.

7. Other relief the Court deems equitable and just.

RESPECTFULLY SUBMITTED this ___3rd___ day of _October_, 2023.

_Lauretta Y. Welch_

Lauretta Y. Welch, WSB #6-4383
Welch Law, PC
P.O Box 567
Driggs, Idaho 83422
(307) 231-6045
(888) 882-7892 (facsimile)
lauretta@welchpc.com
*Attorney for Plaintiff*

## VERIFICATION OF COMPLAINT

I, Dale Omsberg, hereby verify that I have read the above and foregoing Complaint, that I know the contents thereof, and that the facts stated therein are true and correct to the best of my knowledge.

_____
Dale Omsberg

STATE OF WYOMING        )
                        )ss.
COUNTY OF SWEETWATER    )

The foregoing was acknowledged by Dale Omsberg before me this _28th_ day of _September_, 2023.

WITNESS my hand and official seal.

(SEAL)

_____
Notary Public

My Commission expires: June 13th, 2029

G QUICK
Notary Public - State of Wyoming
Commission ID 168595
My Commission Expires June 13, 2029

*Dale Omsberg v. Hydrite Chemical Co.*
*Complaint*
Page 14 of 14

## EMPLOYMENT AGREEMENT

THIS AGREEMENT is made and entered into as of this 15th day of January, 2018 by and between Dale Omsberg ("Employee") and HYDRITE CHEMICAL CO., a Wisconsin corporation ("Hydrite").

## R E C I T A L S:

A.      On this date Hydrite is acquiring substantially all of the assets of Generations, Inc. d/b/a Organic Defoamer Group ("ODG"), pursuant to an Asset Purchase Agreement ("Purchase Agreement");

B.      Hydrite and ODG are engaged in the formulation, manufacture and sale of chemicals used as processing aids in the food, fermentation, mining, and paper industries and activities relating or incidental thereto (collectively, the "Business");

C.      Hydrite desires to employ Employee, and Employee desires to be so employed; and

D.      The parties desire to enter into this Agreement to reduce to writing their agreements concerning such employment.

NOW, THEREFORE, in consideration of the premises set forth above, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.      **Definitions**. In addition to any definitions set forth elsewhere in this Agreement, the following definitions shall apply for purposes of this Agreement:

(a)      "Cause" with respect to the termination by Hydrite of Employee's employment means termination due to (i) the diversion or attempted diversion by Employee of business from Hydrite for Employee's personal gain or benefit, (ii) the commission by Employee of an act of dishonesty involving Hydrite or moral turpitude involving Hydrite, (iii) the habitual use by Employee of alcohol or narcotics which materially and adversely affects Employee's performance of services for Hydrite, (iv) the conviction of Employee of a felony involving Hydrite or serious misdemeanor offense involving Hydrite or pleading guilty or no contest to same, (v) the intentional or willful misconduct of Employee in carrying out Employee's services hereunder, which results in a material injury to Hydrite, (vi) the intentional or willful failure of Employee to follow a specific and lawful directive of the Board of Directors or President of Hydrite, provided such directive is consistent with Employee's position with Hydrite, or (vii) a material breach by Employee of any provision of this Agreement.  In order to terminate Employee's employment for Cause, Hydrite shall give Employee written notice stating in reasonable detail the grounds for termination of Employee's employment for Cause.  Termination for Cause shall be effective as of the date notice thereof is given, except that in the case of termination pursuant to either of the preceding clauses (vi) and (vii), Employee shall have ten (10) days following the date of notice from Hydrite to cure any conduct or act constituting grounds for termination of Employee's employment for Cause, if curable within such period and, if not curable within such period to have

Exhibit 1

begun taking action to cure such conduct or act during such period and to complete such cure within a reasonable period after the end of such period.

(b)      "Competitive Activity" means any business or other endeavor that competes with Hydrite's Business by formulating and manufacturing process aids that are similar to Hydrite's Products; provided, that, a Competitive Activity shall not include (i) any speaking engagement to the extent such speaking engagement does not promote or endorse a competitor of Hydrite's Business, (ii) writing any book or article relating to subjects other than Hydrite's Business (e.g., nonfiction relating to Employee's career, or general business advice), (iv) owning less than three percent (3%) of any publicly traded corporation, whether or not such corporation is in competition with Hydrite, or (v) serving as a director of a corporation or other entity the primary business of which is not a Competitive Activity.

(c)      "Confidential Information" means all information and materials not in the public domain belonging to, used by or in the possession of Hydrite, or information and materials that constitute a trade secret under the Uniform Trade Secrets Act or that otherwise is not generally known to the public and that is developed, owned or obtained by Hydrite or its affiliates relating to their businesses, including without limitation business strategies, Products (sold by Hydrite at the time of any inquiry or analysis) and products, pricing, customers, technology, programs, costs, employee compensation, marketing plans, developmental plans, computer programs, systems and software, inventions, developments, formulae, processes, designs, and drawings. "Confidential Information" also includes confidential information belonging to other companies and disclosed to Employee by Hydrite or any of its affiliates.  However, Confidential Information does not include any information which is or becomes generally available to the public other than as result of an unauthorized disclosure by Employee, including any information that is provided to Employee by a third party without breach of any confidentiality obligation.

(d)      "Customer" means any actual or prospective customer of ODG, Hydrite or Hydrite's affiliates during the Stated Term.

(e)      "Disability" of Employee means (i) any physical or mental illness, disability or incapacity which renders Employee unable to adequately perform his duties hereunder for thirty (30) consecutive working days or sixty (60) working days in any period of ninety (90) consecutive days, or (ii) the receipt by Employee of, or his entitlement to, permanent or total disability payments pursuant to any group disability insurance policy covering Employee and maintained by Hydrite.  The written opinion of a licensed physician who has conducted a thorough physical examination of Employee stating that Employee for medical reasons should terminate or substantially reduce his services to Hydrite shall be conclusive evidence of Disability.  If there is any disagreement as to whether a Disability exists, such disagreement shall be submitted to a licensed physician agreeable to the parties who shall conduct an examination of Employee for the purpose of resolving such disagreement; provided, however, that if the parties cannot agree upon a physician within ten (10) days after written notice by either party to the other, a physician designated by the then acting President of the Medical Society of Waukesha County, Wisconsin shall conduct such examination.  Employee shall submit to such examination, and the determination of such physician as to whether a Disability exists will be binding and conclusive on the parties.

(f)     "Effective Date" means the date of this Agreement.

(g)     "Good Reason" means the Employee's termination of employment if any one or more of the following conditions has arisen without the Employee's written consent:  (i) a material diminution in the Employee's base compensation hereunder; (ii) a material diminution in the Employee's authority, duties or responsibilities; (iii) a material change in the geographic location at which the Employee must perform the services; or (iv) any other action or inaction that constitutes a material breach of this Agreement by Hydrite; provided, however, that in order for such a condition to constitute Good Reason, Employee must notify Hydrite of the existence of the condition constituting Good Reason within thirty (30) days of the initial existence of the condition, Hydrite must be provided a period of at least thirty (30) days after receiving the Employee's notice during which it may cure the condition, and Employee must terminate employment within sixty (60) days following the expiration of such cure period.

(h)     "New Developments" means all ideas, inventions, discoveries and improvements pertaining to the business of Hydrite or its affiliates which Employee may make or conceive, solely or jointly with others, during Employee's employment with Hydrite.

(i)     "Products" means any process aids that are formulated and manufactured by ODG, Hydrite or Hydrite's affiliates in the food, fermentation, mining, and paper industries during the Stated Term, as well as any other chemicals and related activities that are distributed, formulated, and/or manufactured by Hydrite or Hydrite's affiliates, which are actually sold by Employee to a Customer during the Stated Term.

(j)     "Stated Term" has the meaning set forth in Section 6(a).

**2.     Employment; Duties**.  During the term of this Agreement, Hydrite shall employ Employee and Employee shall perform services for Hydrite, on the terms contained herein. Employee's primary duties shall be rendered in connection with the transition of ODG's business and customers to Hydrite, the continuation of Employee's duties and services performed for ODG prior to said transition, and as shall otherwise be reasonably assigned by Hydrite to Employee from time to time.  Employee will perform his services hereunder faithfully and to the best of his abilities, and will devote his best efforts and all of his working time, attention and skill to the business and affairs of Hydrite, consistent with past practice, subject to vacation, illness, disability, and other temporary absences agreed to by Hydrite in advance.  However, Employee may serve as a director, officer or member of a committee of a charitable organization or trade association (provided that the President of Hydrite is notified in advance in writing of all such positions), and may otherwise engage in charitable and community activities, but only if such services and activities do not interfere with the performance of his duties and responsibilities under this Agreement.

**3.     Compensation**.  During the term of this Agreement, Hydrite will pay Employee a monthly salary in the amount of $95,000, with such salary prorated for any month falling partially within the term of this Agreement based on the number of days of employment during such month compared to the number of days in such month.  Such base salary will be payable in accordance with Hydrite's normal payroll practices from time to time in effect for its salaried employees.

Employee shall not be eligible to participate in Hydrite's bonus plan for the first two (2) years of this Agreement.

**4.** **Employee Benefits**.  During the term of this Agreement, Employee shall be entitled to participate in those employee benefits, including without limitation benefits provided under any retirement, medical, vision, life insurance, dental or other health benefit plan (but excluding any vacation pay plan or program, or any bonus plan or program except as expressly agreed to by Hydrite in writing exclusive of this Agreement), which are made available by Hydrite from time to time to its management employees generally.  Specifically as to allowed paid vacation, Employee shall be entitled to twenty (20) days paid vacation time that need not be taken consecutively.  If applicable, Hydrite will provide Employee with a leased automobile pursuant to Hydrite's car lease program for sales employees.

**5.** **Expenses**.  Hydrite will reimburse Employee for out-of-pocket expenses reasonably incurred by him during his employment in connection with the performance of his services hereunder, subject to the submission of documentation substantiating such expenses and other compliance with Hydrite's written policy regarding expense reimbursements.

**6.** **Term**.

(a)    The term of this Agreement shall commence on the Effective Date and shall terminate at the close of business on the third anniversary following the Effective Date (such term being referred to herein as the "Stated Term").  The Stated Term may be extended by the written, mutual agreement of the parties for another year.  Notwithstanding the foregoing, Employee's employment with Hydrite shall terminate upon the occurrence of any of the following events:

(a)    Upon the written agreement of the parties;

(b)    Upon the death or Disability of Employee prior to the end of the Stated Term (and such termination of employment shall be effective immediately upon such death or Disability and without any notice being necessary);

(c)    Upon the termination by Hydrite of Employee's employment at any time prior to the end of the Stated Term for Cause by Hydrite giving written notice to Employee stating the basis for such termination, with such termination becoming effective immediately upon giving such notice or at such other time thereafter as Hydrite may designate in such notice, subject to any applicable cure period;

(d)    Upon the termination by Hydrite of Employee's employment at any time prior to the end of the Stated Term for any or no reason other than Cause, by giving Employee written notice of termination, with such termination becoming effective immediately upon giving such notice or at such other time thereafter as Hydrite may designate in such notice;

(e)    Upon the termination by Employee of Employee's employment at any time prior to the end of the Stated Term without Good Reason by Employee

giving written notice to Hydrite, with such termination becoming effective immediately upon giving such notice; or

(f)    Upon the termination by Employee of Employee's employment at any time prior to the end of the Stated Term with Good Reason by Employee giving written notice to Hydrite, with such termination becoming effective immediately upon giving such notice or at such other time thereafter as Employee may designate in such notice, subject to any applicable cure period.

(b)    Upon Employee's termination of employment for any reason, Hydrite will pay to Employee the full amount of any unpaid base salary earned by Employee pursuant to Section 3 through and including the termination date (and prorated as appropriate).  Hydrite will not be obligated to make any further payments of compensation to Employee except as provided in Section 6(c).

(c)    If Hydrite terminates Employee's employment for other than Cause pursuant to Section 6(a)(d) or if Employee terminates Employee's employment for Good Reason pursuant to Section 6(a)(f), Hydrite shall continue to pay to Employee an amount equal to Employee's then-existing base compensation for the remainder of the Stated Term.

(d)    The termination of Employee's employment shall not affect any of the following rights of Employee:  (i) any rights of Employee accrued through the date of termination pursuant to any qualified retirement or welfare benefit plan maintained by Hydrite in which Employee has participated; (ii) any right of Employee to reimbursement pursuant to Section 5 for expenses incurred prior to termination; (iii) any right of Employee to apply for and receive unemployment compensation benefits and receive workers' compensation benefits pursuant to applicable law; or (iv) any rights arising out of the Purchase Agreement or any Related Agreement (as such term is defined therein) or any written agreement subsequently entered into by the parties.

(e)    If Employee continues to be employed by Hydrite beyond the Stated Term, Employee's employment following the Stated Term shall be at will, provided that the Employee's obligations under Sections 8, 9 and 11 hereof shall apply following his termination of employment even if such termination occurs after the Stated Term.

**7.    Withholding.**  The amounts payable to Employee pursuant to this Agreement are before any deductions for any taxes required or permitted to be withheld by federal, state and local governments.  Hydrite may deduct such taxes which in its reasonable judgment it is required by law to withhold and may rely conclusively on a written opinion of its legal counsel or its independent public accounting firm if any questions should arise as to whether withholding is required.

**8.    Unauthorized Disclosure; Inventions and Improvements**.

(a)    Employee will not disclose to any person or entity, other than employees of Hydrite or its affiliates or other persons to whom disclosure is reasonably necessary or appropriate in connection with the performance by Employee of his services hereunder, any Confidential Information obtained by Employee during his employment by Hydrite or ODG.  Employee also will not use in any manner any Confidential Information for Employee's own purposes or for the

benefit of any person or entity except Hydrite or its affiliates, whether such use consists of duplication, removal, oral communication, disclosure, transfer or other unauthorized use thereof.

(b)     Employee will disclose to Hydrite and upon its request, assign to Hydrite or its designee, without charge, all of Employee's right, title and interest, if any, in and to any and all New Developments.  Upon request by Hydrite, whether during or subsequent to Employee's employment, Employee will do any and all acts and execute and deliver such documents as may be deemed by Hydrite or its counsel to be necessary or advisable to vest in Hydrite or its designee all of Employee's right, title and interest in and to such New Developments and to apply and obtain domestic or foreign patents, provided that the expenses incurred in connection with the foregoing shall be borne by Hydrite.  If services in connection therewith are performed at Hydrite's request after the termination of Employee's employment with Hydrite, Hydrite will pay Employee reasonable compensation for such services.  The term "New Developments" shall not include any ideas, inventions and discoveries which Employee develops or makes at his expense when not fulfilling his duties to Hydrite or any affiliate and which are not related to the business of Hydrite or its affiliates.

(c)     Employee acknowledges and agrees that each work of authorship created by Employee in the performance of his services during his employment by Hydrite and its affiliates, and relating to their Products, services, or businesses will be prepared for Hydrite as a work-for-hire, and further agrees that in the event any such work is not considered a work-for-hire under United States Copyright Law, Employee upon written request shall immediately assign all copyrights in and to such work of authorship to Hydrite or its designee.

9.     **Surrender of Material Upon Termination**.  Upon termination of employment by Hydrite, for whatever reason, Employee will immediately surrender (or, at Hydrite's written direction, destroy) to Hydrite  and its affiliates all of the property and other things of value in his possession or in the possession of any person or entity under his control and belonging to Hydrite and/or its affiliates or relating to their businesses, including, without limitation, all personal notes, drawings, manuals, handbooks, documents, software, computer files, photographs or the like, including copies thereof.

10.     **Common Law of Torts or Trade Secrets**.  Nothing in this Agreement shall be construed to limit or negate the common law of torts or trade secrets or applicable state trade secrets law where such common law or state law provides Hydrite or its affiliates with broader protection than the protection provided by this Agreement.

11.     **Cooperation after Termination**.     Following Employee's termination of employment with Hydrite, Employee shall reasonably cooperate with Hydrite and its affiliates and will render such reasonable assistance as Hydrite and its counsel may reasonably request in connection with the defense, compromise or settlement of any claim, demand, action, suit or proceeding with a third party pertaining to Hydrite or its affiliates and arising out of any action, occurrence or failure to act of or by Hydrite or its affiliates, or their officers and/or their employees during Employee's employment with Hydrite (unless Employee's interest in any such claim, demand, action, suit or proceeding is, in the written opinion of Employee's counsel, actually or potentially adverse to the interest of Hydrite or any of its affiliates).  Employee will be reimbursed by Hydrite for his time and reasonable out-of-pocket expenses incurred in connection with the

rendering of such assistance, including the reasonable fees and expenses of Employee's counsel if retention of counsel by Employee is reasonably required in the circumstances as mutually agreed upon by the Parties.

12.    **Restrictions**.

(a)   During Employee's employment by Hydrite, and for a period of three (3) years following separation from Hydrite,  Employee hereby covenants and agrees that Employee will not, directly or indirectly:

(i)   own, operate, manage, join, finance, control, participate in the ownership, management, operation or control of, or be paid or employed by or acquire any securities of, or otherwise become associated with or provide services or assistance to, any individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, or other entity (collectively referred to as "Person") that is engaged in the United States in a Competitive Activity;

(ii) sell or solicit to sell any Products or similar products to any Customer for use, except for or on behalf of Hydrite or its Affiliates; or

(iii) solicit, cause, or seek to cause any employee of Hydrite to terminate, curtail or otherwise modify his or her employment relationship with Hydrite.

(b)   Employee acknowledges and agrees that the restrictions set forth in Section 12.(a) are founded on valuable consideration and are reasonable in duration and geographic area in view of the circumstances under which this Agreement is executed and that such restrictions are necessary to protect the legitimate interests of Hydrite.  In the event that any provision of Section 12.(a) is determined to be invalid by any court of competent jurisdiction, the provisions of Section 12.(a) shall be deemed to have been amended and the parties will execute any documents and take such action as may be necessary to evidence such amendment, so as to eliminate or modify any such invalid provision and to carry out the intent of Section 12.(a) so as to render the terms of Section 12.(a) enforceable in all respects as so modified.

(c)   Employee acknowledges and agrees that irreparable injury will result to Hydrite in the event that Employee breaches any covenant contained in Section 12.(a) and that the remedy at law for such breach will be inadequate.  Therefore, if Employee engages in any act in violation of the provisions of Section 12.(a), Hydrite shall be entitled, in addition to such other remedies and damages as may be available to them at law or under this Agreement, to injunctive or other equitable relief to enforce the provisions of Section 12.(a) and to the recovery of legal costs and expenses, including without limitation reasonable attorneys' fees and expenses, incurred by Hydrite in enforcing this Agreement.

13.    **Confidentiality**.  Employee acknowledges that (a) Hydrite's customers, customer lists, marketing, production, sales techniques, procedures, operations, and other Confidential

Information, including the intangible assets of the Business, which are to be acquired by Hydrite, have been established and maintained at great expense, have been protected as confidential information and trade secrets, and are or will be of great value to Hydrite, and (b) Hydrite would suffer great loss and injury if Employee would disclose this information and the Confidential Information or use it in any way to the detriment of Hydrite.  Therefore, Employee shall not, directly or indirectly, during Employee's employment with Hydrite or within three (3) years after Employee's separation from Hydrite, use or disclose, or cause or allow to be used or disclosed, any of this information or the Confidential Information, unless and to the extent that any such information is or becomes in the public domain.  If Employee is requested or required by oral question or request for information or documents in any legal proceeding, interrogatory, subpoena, civil investigative demand, or similar process to disclose any Confidential Information, Employee shall, unless legally prohibited, notify Hydrite of the request or requirement so that Hydrite may seek an appropriate protective order or waive compliance with the provisions of this Section.  If, in the absence of a protective order or the receipt of a waiver hereunder, Employee believes in good faith based on the opinion of legal counsel that it is compelled to disclose any such Confidential Information pursuant to such legal proceeding, interrogatory, subpoena, civil investigative demand or similar process or else stand liable for contempt or other penalty, Employee may disclose such Confidential Information; provided, however, that Employee shall reasonably cooperate with Hydrite in its attempts to obtain an order or other assurance that confidential treatment will be accorded to such portion of such Confidential Information required to be disclosed.

       14.    **Prior Employment**.  Employee hereby represents and warrants that Employee is not a party to any currently effective agreement (whether written or oral) with any other third party other than ODG restricting Employee in any way with respect to the performance of his duties hereunder, including, without limitation, restrictions relating to noncompetition, nonsolicitation or the like.

       15.    **Severability**.  The invalidity or unenforceability of any provision of this Agreement shall not affect or impair the validity or enforceability of any other provision and this Agreement shall be construed as if such invalid or unenforceable provision were not contained herein.

       (a)    **Notices**.  Each notice, request, demand or other communication ("Notice") by either party to the other party pursuant to this Agreement shall be in writing, and shall be personally delivered or sent by certified or registered mail, recognized commercial courier, addressed to the address of the receiving party set forth below or to such other address as such party shall have communicated to the sending party in accordance with this section.  Any Notice hereunder shall be deemed to have been given and received when personally delivered, on the third business day following the date of mailing when sent by certified or registered mail, and on the first business day following the date of sending when sent by commercial courier via overnight delivery service.

       If to Employee:

            Dale Omsberg
            276 S. Third East Street
            Green River, WY  82935

If to Hydrite:

        Hydrite Chemical Co.
        300 N. Patrick Boulevard, Suite 200
        Brookfield, WI 53045
        Attn:  Legal Department

**16.**    <u>**Waiver**</u>.  A waiver by a party of any breach by the other party of any provision of this Agreement shall not be deemed to be a waiver by such first party of any subsequent breach.

**17.**    <u>**Assignment**</u>.  Employee may not assign, pledge or encumber this Agreement or any interest herein.

**18.**    <u>**Binding Effect**</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto, Hydrite's successors and assigns and Employee's heirs and legal representatives.

**19.**    <u>**Complete Agreement; Amendment**</u>.  This Agreement constitutes the complete agreement of the parties concerning it subject matter, and may be amended only by a written instrument executed by the parties hereto or their respective successors, assigns, heirs or legal representatives, as applicable.

**20.**    <u>**Governing Law; Venue**</u>.  This Agreement shall be governed exclusively by the laws and the courts of the State of Wisconsin.

**21.**    <u>**Expenses**</u>.  Each party hereto shall be responsible for the payment of all expenses incurred by such party in preparing, negotiating and entering into this Agreement.

**22.**    <u>**Attorneys' Fees**</u>.  In the event an action or proceeding is instituted to enforce or interpret the provisions of this Agreement, each Party shall pay its own attorneys' fees.

**23.**    <u>**Section 409(A) of the Internal Revenue Code**</u>.

(a)    Except to the extent earlier payment is permitted by Section 409A of the Internal Revenue Code, or any successor provision of the Internal Revenue Code, and the regulations promulgated thereunder (collectively, the "Code"), if any amount due to Employee hereunder after the termination of employment is considered to be deferred compensation pursuant to Section 409A of the Code, and it is determined that the Employee is a "specified employee" for purposes of Section 409A(a)(2)(B)(i) of the Code, then Hydrite shall delay the payment of such amount for six (6) months after the termination of employment (or until death, if earlier) or for such other amount of time as may be necessary to comply with the requirements of Section 409A(a)(2)(B)(i) of the Code.

(b)    This Agreement is intended to comply and shall be administered in a manner that is intended to comply with Section 409A of the Code and the interpretative guidance thereunder, including the exceptions for short-term deferrals, separation pay arrangements, reimbursements and in-kind distributions.  This Agreement shall be construed and interpreted in accordance with

such intent. In addition, each payment shall be considered a separate payment for purposes of Section 409A of the Code and any termination of employment under this Agreement shall mean a separation from service as defined in Section 409A of the Code and Treas. Reg. §1.409A-1(h)(1)(ii) (or other similar or successor provision). The parties agree to make such other amendments to this Agreement as are necessary to comply with the requirements of Section 409A of the Code.

(c)     Notwithstanding anything herein to the contrary, neither Hydrite (nor its affiliates) nor any of its respective directors, officers, employees or agents makes or has made any representation or warranty with respect to any applicable tax, financial, estate planning, or securities law, or other legal implications, associated with participation in this Agreement and any other agreements or arrangements referenced in this Agreement. Employee acknowledges that Employee has been instructed to consult with Employee's own tax, financial, and legal advisors with respect to Employee's participation in this Agreement and any other agreements or arrangements referenced in this Agreement. By accepting this Agreement, Employee represents to Hydrite through his acceptance of this Agreement that Employee has done so to the extent Employee believed appropriate. Notwithstanding anything herein to the contrary, provided that Hydrite reasonably cooperates with Employee to make any necessary amendments to this Agreement pursuant to Section 23(b), neither Hydrite (or its affiliates), nor any officer, director, agent, or employee, past, present or future, of Hydrite (or its affiliates) shall be liable for any income tax, employment tax, interest, or penalties that may be imposed on Employee, including under Code Sections 409A or 3121(v)(2), or for any damages resulting from a failure to comply with the requirements of Code Sections 409A or 3121(v)(2) with respect to amounts payable under this Agreement and any other agreements or arrangements referenced in this Agreement.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement on the date first above written.

**HYDRITE CHEMICAL CO.**

By: _____
     **John A. Honkamp**

**Title:  Chairman**

_____
**Dale P. Omsberg**

## Summary and next step

Hi Dale,

Thanks for your time with Jon and Dan today.  Based on expressed concerns from Hydrite employees and your direct threats to others, we are requiring a Fitness For Duty assessment as a next step in your employment with Hydrite.  As you know, safety is Hydrite's number one concern for all of our employees, and that includes you and your personal safety.

The purpose of the assessment is to determine if an employee is safe to perform his/her job function and in this instance, it will include a violence screen.  The assessment consists of two parts:

- 2-3 hour assessment with a clinician in person
- Follow Up personality assessments

Exhibit 2

Hydrite will reach out to you about a scheduled appointment in the next couple days. Once you arrive at the appointment, you will need to complete an authorization form, which allows the third party to release their assessment to Hydrite for follow up.

Below is a recap of your discussion with Dan and Jon:

- You will be suspended *with pay,* until we have the results of the assessment
- At this time, you may contact me, Dan and Jon. Do not reach out to any other Hydrite employees.
- You are *not allowed onsite* at your customers during this timeframe.

We expect to have feedback in this process within the next couple weeks and will contact you at that time to discuss how to best move forward. In the meantime, our Employee Assistance Program is available 24/7 for you, at Life Matters. They can be reached at (800)-634-6433 or mylifematters.com – password: HYD1.

Regards,

Work rules and regulations have been established to promote a safe and healthy work environment, to enhance productivity and profitability, and to provide a rewarding work experience for all employees.  Employees shall be responsible and held accountable for their actions.

When it is determined that an employee is not fulfilling the responsibilities of the position to which they are assigned, all reasonable steps should be taken prior to discharge.  To determine objectively that the employee has been given an opportunity to correct a deficiency, Company has developed a progressive discipline policy.

Discipline may be appropriate when there has been an infraction against a work rule or Regulation.  Depending upon the circumstances, discipline issued may be a verbal warning, written warning, suspension without pay, or termination.  Progressive discipline may not be followed in all cases.  Depending upon the nature of the violation and the circumstances, one or more steps of the progressive discipline system may be repeated or skipped.  In some circumstances, termination may be the first step.

After a formal disciplinary action has been issued to an employee, the employee will remain at that step within the progressive discipline process for a minimum of one (1) year, which may be lengthened depending on the nature and severity of the issue.  After one (1) year has passed, documentation of the disciplinary action will remain in the employee's personnel file, but it may not be considered for any future formalized discipline that the employee may receive.  The Company reserves the right to terminate any employee for any reason including but not limited to lack of work, incompetence, failure to comply with these policies and any other Company policies and procedures.  These guidelines can be amended by the Company within its total discretion.

In some cases, the level of discipline cannot be immediately determined until additional information is gathered.  If more time is needed to gather facts, the employee should be informed that disciplinary action will be forthcoming after an investigation is completed.  If multiple infractions occur from multiple Work Rules, the more serious discipline level should be used and both infractions cited.

Employees who are being disciplined should be reminded that they have access to the Employee Assistance Program (EAP).

Copies of all documentation relating to performance or discipline of an employee should be sent to the HR department for the employee's personnel file.

## INTRODUCTORY PERIOD

The first ninety (90) days of employment following the start date of a new hire or rehire, if rehired more than one (1) year after the date of termination, shall be considered the introductory period. The introductory period provides Company an opportunity to observe and evaluate the employee's performance, which will include, but is not limited to, evaluation of safety, quality, reliability, productivity, and adherence to Company's Building Blocks.  Depending on performance during the introductory period, the employee may be eligible for a merit increase. Employment is not guaranteed for the duration of the introductory period and an employee may be terminated at any time during the introductory period or thereafter without notice.  Successful completion of the introductory period does not guarantee continued or permanent employment.

Exhibit 3

The Company may terminate employment immediately with or without cause and with or without notice.  Likewise, the employee may also terminate their employment at any time with or without notice or with or without cause.  The introductory period is not a term of employment and does not impact the at will nature of the relationship between the employee and the Company.  Progressive discipline may not apply during the introductory period.

## STEP 1:  DOCUMENTED COACHING

When a minor infraction occurs, employees will receive documented coaching.  Leaders provide feedback to help drive expected performance standards and reinforce positive behaviors before a performance problem results in further disciplinary action.  Employees and leaders should include the following:

1. Review and discuss the identified infraction presenting perspectives on the problem.
2. Advise the employee of the proper steps to help prevent this from occurring again and to ensure alignment on performance expectations.
3. Identify if there is any training needed to enable acceptable performance.
4. Advise the employee that if the problem is not corrected, that it may result in further disciplinary action.
5. Communicate to the employee this will be a Documented Coaching.
6. Document the discussion for future reference and place a copy in the employee's file with HR.

## STEP 2:  VERBAL WARNING

When a performance problem is first identified, it should be thoroughly discussed with the employee, preferably with a neutral witness present. The supervisor should:

1. Review the problem and discuss the problem with the employee allowing them to present their views on the problem
2. Advise the employee that the problem must be corrected and that failure to do so will result in further disciplinary action
3. Objectively state the acceptable standard, behavior or attitude that must be attained
4. Communicate to the employee that this is a Verbal Warning
5. Document the discussion for future reference and place a copy in the employee's file with HR.  Documentation should include:
    o The work rule violated or the performance deficiency
    o The date the infraction occurred
    o Any other relevant information supporting the need for discipline
    o The date the verbal warning was issued
    o Information on how to access the Company's Employee Assistance Program

## STEP 3:  WRITTEN WARNING

If the conduct addressed by a verbal warning is repeated or additional work rule violations occur, the supervisor should follow up with a written warning. If a single incident is more serious than is appropriate for a verbal warning, the supervisor should issue a written warning.

Written warnings should be documented and include the following:

- The work rule violated or the performance deficiency
- The date the infraction occurred
- Information on similar or previous infractions
- Any other relevant information supporting the need for discipline
- The date the warning was issued
- Information on how to access the Company's Employee Assistance Program
- State the expectations of the employee for continued employment
- State that continued infractions will result in continued discipline, up to and including termination

The written warning should be signed by the employee and presenting supervisor.  If the employee refuses to sign the warning, make a note directly on the document that the employee refused to sign.

## STEP 4:  DECISION DAY AND SUSPENSION

Suspension without pay should be used as an alternative to discharge in the case of serious offenses.  The employee will be dismissed from work for a defined period.  To return to work, the employee must detail in writing their specific plan to change the behavior or performance which resulted in the suspension.  The time off will be without pay and will be subject to applicable laws and regulations governing exempt employees.

A Decision Day notice should be provided to the employee and should include the following:

- The work rule violated and the performance deficiency
- The date(s) the infraction(s) occurred
- If applicable, cite the date of the previous relatable verbal warning or written warning
- State the expectations of the employee for continued employment
- Any other relevant information supporting the need for discipline
- The date(s) the employee will be suspended without pay
- State that continued infractions will result in continued discipline, up to and including termination
- The date the employee will be required to return their written action plan and that failure to write a written action plan may result in termination or failure to write a reasonable action plan may require that the employee rewrite their action plan and failure to do so may result in termination
- Information on how to access the Company's Employee Assistance Program

The Decision Day notice should be signed by the employee and presenting supervisor.  If the employee refuses to sign the decision day letter, make a note directly on the letter that the employee refused to sign.

## STEP 5:  TERMINATION

In appropriate circumstances employment will be terminated.  Termination should be used in the case of serious offenses.  If appropriate, an employee can be put on suspension while the decision to terminate is being made.  Supervisors shall discuss disciplinary issues with the appropriate HR Manager and/or Chief Human Resources Officer ("CHRO") who will review all disciplinary actions prior to issuance of action.

Whenever possible, a letter explaining the reasons for termination should be given to the employee at the time of termination and should include the following:

- Actions that led up to their termination
- The final incident that brought the Company to the point of termination, including the work rule that was violated
- That they will receive benefit information from the HR department in the near future
- Information on how to access the Company's Employee Assistance Program

## WORK RULES

Discipline may begin at any step in the process, including termination of employment.  The following descriptions are merely guidelines for managers, which may not be followed when the Company determines that circumstances indicate that a different level of discipline is appropriate.  With the exception of a Type D Work Rule violation, discipline is often progressive.

**TYPE "1A" WORK RULE**

Noncompliance with any TYPE "1A" Work Rule may result in a Documented Coaching, Verbal Warning, Written Warning, Suspension/Decision Day, or Termination.

Type 1A Work Rules include minor infractions in the areas of Safety, Quality, Reliability, Documentational Errors, Productivity, or non-conformance to Company's Building Blocks.

**TYPE "A" WORK RULE**

Noncompliance with any TYPE "A" Work Rule may result in a Verbal Warning, Written Warning, Suspension/Decision Day, or Termination.

Absenteeism**:**

- Absent without giving notice.  Supervisors must be notified at least two hours prior to shift start time.  Reporting an absence to a co-worker does not meet this requirement.  Text messaging is only acceptable if your supervisor has approved this method of communication.  Emergency situations will be reviewed.
- Excessive or unexcused absence(s).
- If absence is due to an illness, a doctor's excuse must be provided upon return if:
  - Three consecutive work days have been missed;
  - The absence occurs during the first 90 days of employment; or
  - It is requested by the supervisor.

Tardiness:  Excessive or unexcused tardiness is subject to timesheet adjustment.  Supervisor must be notified at least two hours prior to shift start time.  Reporting tardiness to a co-worker does not meet this requirement.  Text messaging is only acceptable if your supervisor has approved this method of communication.  Emergency situations will be reviewed.

Workmanship:  Failure to maintain expected standards of quality work, including poor workmanship, inattentiveness, or unwillingness to perform primary job duties.

Safety/Regulatory Compliance:

- Any violation of safety rules as prescribed by the Company which does not result in noncompliance with occupational safety and health regulations, harm to personnel, work environment, or the community.

- Failure to follow SOPs or other Company rules or practices where such failure does not result in a violation of governmental or environmental requirements and does not result in actual harm, or an imminent threat of harm to human health, the environment, Company facilities, or equipment.

- Smoking, vaping, and the use of all tobacco and cannabis products on Company property, or any other violation of the Smoke and Vape-Free Workplace policy.

Company Policy Compliance:  Failure to follow company policy.

**TYPE "B" WORK RULE**

Noncompliance with any TYPE "B" Work Rule will generally result in a Written Warning, Suspension/Decision Day, or Termination.

Leaving Without Permission:

- Permission must be obtained from the supervisor or manager to leave the workplace, except when on Company business or on a scheduled lunch break.  Hourly employees must punch out when leaving and punch in upon return.
- Employees may not leave their work areas except as needed to comply with performing their duties or to take designated breaks, which are to be taken at established times.
- Taking paid breaks which violate the Smoke and Vape-Free Workplace Policy.

Leaving Prior to End of Scheduled Shift:  Anyone who leaves the workplace for the day prior to their scheduled shift must advise the supervisor or manager and obtain permission.

Workmanship:  Repeated failure to maintain expected standards of quality work, including poor workmanship, inattentiveness with minor adverse results, or unwillingness to perform primary job duties.

Loafing, Loitering:  Loafing, loitering, or engaging in unauthorized visiting is prohibited during work time.

Performing Non-Company Work:  All work performed on Company premises or during Company time must be for the direct benefit of the Company, unless otherwise authorized.

Safety/Regulatory Compliance:

- Any violation of safety rules as prescribed by the Company which results in noncompliance with occupational safety and health regulations but does not result in harm to personnel, work environment, or the community.

- Failure to follow SOPs or other Company rules or practices which results in noncompliance with governmental or environmental rules which does not result in actual harm, or an imminent threat of harm, to human health, the environment, Company facilities, or equipment.

<u>Negligence</u>:  Failure to exercise reasonable caution to protect the employee's safety, the safety of others, the equipment, the product, or the facility that results in the threat of injury or damage. Failure to exercise reasonable efforts, diligence, or attention in performing assigned responsibilities.

<u>Work Hours</u>: Working overtime hours without prior authorization.  Performing work off the clock. Requiring an employee to work off the clock.

<u>Company Policy Compliance</u>:  Failure to follow Company policy.

**TYPE "C" WORK RULE**

Noncompliance with any TYPE "C" Work Rule will generally result in a Suspension/Decision Day or Termination.

<u>Negligence</u>:

- Failure to exercise reasonable efforts, diligence, or attention in performing assigned responsibilities.
- Failure to exercise reasonable caution to protect the employee's safety or the safety of others, causing injury to oneself or others.
- Willful neglect causing damage to product, equipment, property or causing harm to oneself or others.

<u>Insubordination</u>:

- Refusal to carry out or comply with orders of management, supervisors, or lead persons causing an imminent threat of damage to product, equipment, property or causing an imminent threat of harm to oneself or others.

<u>Safety/Regulatory Compliance</u>**:**

- Any violation of safety rules as prescribed by the Company which results in an imminent threat of harm to oneself, others, product, equipment, work environment, facility, or the community.
- Failure to follow SOPs or other Company rules or practices which results in an imminent threat of harm to oneself, others, human health, the environment, or Company facilities or equipment.

<u>Workmanship</u>**:**  Repeated failure to maintain expected standards of quality work, including poor workmanship, inattentiveness with adverse results, or unwillingness to perform primary job duties.

<u>Company Policy Compliance</u>:  Failure to follow Company policy.

Under the Influence of Alcohol or Drugs:  The use of or working under the influence of intoxicants, dangerous or illegal substances during working hours, on Company property, on Company time, or while operating a Company leased or owned vehicle will be handled in accordance with the Company's Alcohol, Drug, and Controlled Substance Policy.

**TYPE "D" WORK RULE**

Noncompliance with any TYPE "D" Work Rule will generally result in Termination.

Falsification of Records/Dishonesty:  Including but not limited to:

- Misrepresentation on application including pre-employment history;
- Time cards;
- Production worksheets;
- Reasons for absence or tardiness;
- Personnel records;
- Any dishonesty in any matter concerning employment or other job performance;
- Medical records including medical excuses;
- Claims for workers' or unemployment compensation;
- Benefit enrollment and claims;
- Loan applications;
- Company reimbursed expenses;
- Operating, laboratory, environmental, regulatory, or safety records;
- Withholding information causing unsafe practices; or
- Any act deemed to be gross misconduct.

Any employee who is found making a false or fraudulent Worker's Compensation claim or engaging in conduct or activities which serve to lengthen the healing period for a work-related injury or illness, will face disciplinary action up to and including termination.  The employee may also be denied benefits.  In addition, employees may be criminally prosecuted for Worker's Compensation fraud.

Sale/Possession of Illegal Substances:  The sale or possession of illegal substances during working hours, on Company property, on Company time, or while operating a Company leased or owned vehicle will be handled in accordance with the Company's Alcohol, Drug, and Controlled Substance Policy.

Theft:  Theft of time, Company property, or the property of others.

Safety/Regulatory Compliance:

- Any violation of safety rules as prescribed by this company which results in actual harm, or an imminent threat of harm to oneself, others, human health, the environment, product, equipment, work environment, Company facilities, or the community as determined jointly by the EHS Department, the Human Resource Department and the appropriate manager.
- Failure to follow SOPs or other company rules or practices which results in actual harm, or an imminent threat of harm to oneself, others, human health, the environment, product, equipment, work environment, Company facilities, or the community as

determined jointly by the EHS Department, the Human Resource Department and the appropriate manager.

- <u>Data Integrity</u>:  Falsification or omission of relevant information on Company documents, statements, or permits.
- <u>Management of Change (MOC)</u>:  Making a process change without the required EHS review or MOC.
- <u>Proper Operation</u>:  By-passing pollution control equipment, process safety controls, or interfering with pollution monitoring, sampling, control systems, or process safety equipment without proper maintenance lockout tag out.
- <u>Reporting</u>:  After securing the area, all non-routine chemical releases which are in excess of a reportable quantity according to chemical release procedures must be reported.  Releases include spills, vapor releases, and malfunctions.
- <u>Safety Permits</u>:  Performing hazardous work without obtaining a safety permit.  Permits include Confined Space Entry and Hot Work.

<u>Conduct</u>:

- Threatening or abusing fellow employees or other persons.
- Abusive or profane language toward fellow employees or other persons.
- Acts intended to destroy or damage property.
- Horseplay.
- Sleeping during working hours.
- Threatening a manager or supervisor.
- Illegal acts performed on Company property.

<u>Insubordination</u>:

- Refusal to carry out or comply with orders of management, supervisors, or lead persons causing damage to product, equipment, property, or causing harm to oneself or others.

<u>Disappearance</u>:  Unexplained absence(s) on one or more consecutive days.

<u>Workmanship</u>:  Failure to maintain expected standards of quality work, including poor workmanship, inattentiveness with adverse results, or unwillingness to perform primary job duties; intentionally holding back, slowing down, or hindering production.

<u>Company Policy Compliance</u>:  Failure to follow Company policy.

## **PAID HOLIDAYS**

| | |
|---|---|
| New Year's Day | Labor Day |
| New Year's – Extra Day | Thanksgiving Day |
| Good Friday (1/2 Day Flexible Holiday) | Day after Thanksgiving |
| Memorial Day | Christmas Day |
| Independence Day | Christmas - Extra Day |

*The extra day for New Year's and Christmas will be scheduled on an annual basis depending upon the day of the week on which the holiday falls and on production or customer needs. There will be some years that the Christmas – Extra Day and/or New Year's – Extra Day will be